## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

JOHN H. DELEVA, et al.,         :      Case No. 1:04cv1299

                    :

        Plaintiffs,      :      JUDGE KATHLEEN O'MALLEY

                    :

v.                       :

                    :

REAL ESTATE MORTGAGE CORP.,   :      <u>ORDER</u>

et al.,                  :

                    :

        Defendants.      :

                    :

This case involves claims asserted under the Family Medical Leave Act, 29 U.S.C. § 2601, *et. seq.* ("FMLA"), the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et. seq.* ("ERISA"), and pendent state law claims.

Plaintiffs John H. Deleva and Sherri A. Deleva ("Plaintiffs") originally filed a seven-count Complaint against their former employers, Real Estate Mortgage Corp. and Real Estate Mortgage Corp. Escrow Company (collectively, the "REMC Entities"), and Mark A. Johnston ("Johnston") - the sole Shareholder and President of the REMC Entities. The action was pending in the Cuyahoga County Court of Common Pleas before being removed to this Court. The Complaint was subsequently amended to include an eighth cause of action.

By their Amended Complaint, Plaintiffs assert four claims under the FMLA for wrongful discharge and retaliation; two claims under ERISA for denial of disability benefits and medical insurance; a breach of contract claim; and a claim under the theory of promissory estoppel.

Pending before the Court is a Motion for Summary Judgment (Doc. No. 50) filed by the REMC Entities and Johnston, seeking judgment as a matter of law on all claims asserted in the Amended Complaint. For the reasons set forth below, the Motion is **<u>GRANTED</u>**.

## I.      BACKGROUND

The following facts are not disputed, except where noted.  Plaintiff John Deleva ("Deleva") began working for the REMC Entities in or around November 1989 as a Senior Residential Lending Specialist (RLS).  Plaintiff Sherri Deleva ("Mrs. Deleva") began working for the REMC Entities - strictly as Deleva's personal assistant - in or around May 1996.  As a Senior RLS, Deleva's duties included the origination of first and second mortgages, and the oversight of other RLS professionals who reported to Deleva.  Deleva's compensation was based on commissions relating to the gross revenue of loans he originated.

Prior to June 2003, the REMC Entities had two shareholders: Thomas Rankin ("Rankin") and Defendant Johnston.  Rankin and Johnston each owned approximately 50% of the shares of the REMC Entities.  In or around June 2003, however, Johnston purchased Rankin's stock, making Johnston the sole shareholder.

Plaintiffs contend that, prior to this sale, in or around August 2002, Johnston and the REMC Entities offered to allow Deleva and Jean Miller ("Miller") - a management-level employee - the opportunity to later purchase, from Johnston, the REMC stock that was going to be sold to Johnston by Rankin.  Plaintiffs claim Johnston promised Deleva and Miller that they would be able to acquire the stock at the same price, and under the same financing terms, that Johnston and/or the REMC Entities would be paying to Rankin when Rankin sold his stock to Johnston.  Plaintiffs assert Deleva and Miller accepted this promise made by Johnston.

Between August 2002 and January 2004, however, Plaintiffs claim that the defendants took no further action with respect to the stock purchase offer - despite efforts by Deleva and Miller to induce the defendants to implement and affirm the promise, and to document the agreement.  All that occurred,

2

according to Plaintiffs, was some discussion among Deleva, Miller, and Johnston regarding "other options" for the financing of the purchase, and the possibility of an increased price for the stock. Plaintiffs argue that, although Johnston announced to REMC employees his intent to purchase Rankin's shares and for Deleva and Miller to obtain ownership in the company as well, Johnston and the REMC Entities reneged on their promise to sell Rankin's former shares to Deleva and Miller.  As a result, Plaintiffs claim that the relationship between Deleva and the defendants deteriorated to the point where Deleva's position at the REMC Entities became difficult and intolerable.

Johnston and the REMC Entities deny a stock purchase offer was ever made to Deleva and Miller.  They argue the parties simply had ongoing discussions regarding the *possibility* of Deleva and Miller each purchasing twenty-four shares of the stock of REMC.  Assuming such an offer was made, however, the defendants deny Deleva accepted any such offer, or that the terms of the alleged purchase agreement were definite.  Neither party disputes that any envisioned sale of stock to Deleva and Miller was to occur *after* a stock purchase agreement was worked out between Johnston and Rankin.  Yet, the defendants argue, Plaintiffs claim they had a contract with the defendants on the same terms Rankin had with defendants as of August 2002 - which was at least eight months before any agreement was ever reached with Rankin.[1]

In support of their position, defendants cite to Deleva's own deposition testimony.  This testimony confirms that Deleva did not accept any offer put forth in August 2002, and that no agreement was consummated at that time.  (Deleva Dep. pp. 149, 155, 175.)  According to Deleva's testimony,

---

[1] An Affidavit submitted by Thomas Rankin attests that the purchase price for Johnston's acquisition of Rankin's stock had not yet been determined in August 2002, and that Rankin did not agree to the terms of the sale of his shares of REMC stock to Johnston until April 2003. (Rankin Aff. ¶¶ 7-8.)

3

rather, he had "reservations" about the proposal when it was initially discussed.  (Deleva Dep. pp. 149-50.)  He did not, therefore, accept or reject the proposal in August 2002; instead, he simply remained quiet.  (*Id.*)  Several more discussions regarding the proposal took place after August 2002, and Deleva does not recall a specific date on which he accepted any particular proposal.  (*Id.* pp. 155-57.)  It was during these subsequent discussions that Deleva contemplated obtaining outside financing and/or paying cash for his shares (rather than having REMC finance the acquisition through distributions to Deleva, which he asserts was part of the original proposal), and also considered paying a higher purchase price than originally contemplated.[2]  (*Id.* pp. 180-182, 257-59.)

In or around January 2004, in an attempt to "lock down" the earlier discussions with Johnston, correspondence was drafted by Deleva and Miller - with the assistance of legal counsel - and sent to Johnston by either Deleva or Miller.  (*Id.* pp. 172-74, 212.)  The correspondence contained a recitation of Deleva's and Miller's general understanding with respect to the conversations that had taken place

---

[2] The price originally contemplated by Deleva for his half of the shares of Rankin's former stock was five hundred thousand dollars.  (Deleva Dep. p. 91.)  This was based upon Deleva's belief that one million dollars was the purchase price being negotiated between Johnston and Rankin with respect to Johnston's acquisition of the entire forty-eight shares of Rankin's stock.  Deleva also believed the repayment terms being negotiated between Johnston and Rankin contemplated payment over a five-year period, at a five percent rate of interest.  (*Id.* pp. 82-85.)  There was no understanding on the part of Deleva, however, with respect to whether Johnston agreed to repay Rankin on an annual, semi-annual, quarterly, or monthly basis.  (*Id.* p. 89.)  Accordingly, there was no discussion between Johnston and Deleva with respect to the frequency of Deleva's future repayment to Johnston, or what would occur if a payment was missed and Deleva was in default.  (*Id.* 111, 117, 123, 189.)  Nor were any of the details of the transfer worked out, including a date for transfer of the stock to Deleva.  (*Id.* pp. 96, 101, 152.)  Finally, there was no discussion between Johnston and Deleva with respect to whether Deleva's twenty-four shares would be free of any encumberances that might arise in the transaction between Johnston and Rankin.  (*Id.* pp. 103-07.)  Deleva, nevertheless, asserts that he, along with Miller, subsequently agreed to pay a total of 1.3 million dollars for all forty-eight shares of the former Rankin stock.  Deleva asserts that he and Miller further agreed to pay their share of the purchase price in cash.  (*Id.* pp. 179-82, 256-57.)

4

among the parties beginning sometime prior to August 2002, and continuing up to January 2004.  (*Id.* pp. 197, 211.)  The document contained signature lines for Deleva, Miller, and Johnston to express their agreement to the terms contained in the document.  (*Id.* pp. 200, 212.)  Deleva asserts that he anticipated that Johnston would either confirm Deleva's and Miller's understanding of these discussions, or advise Deleva and Miller of any changes to - or mischaracterization of - the parties' agreement.  (*Id.* pp. 190-192.)

The document drafted by Deleva's counsel in January 2004 did not contain any reference to REMC funding Deleva's stock purchase through company disbursements, as allegedly promised, because the document "essentially was a working document to move or advance these discussions to consummation of the deal."  (*Id.* pp. 199-200.)  The document did, however, contain other specific terms - such as a closing date for the deal, the events that would occur at the closing, and the payment of Deleva's and Miller's attorney fees by the REMC Entities - none of which were discussed or agreed upon in any prior conversation.  (*Id.* pp. 203, 206, 209-10, 217-18.)  Also mentioned in this document was the increased purchase price for the REMC stock.  (*Id.* pp. 179-82.)  Deleva considered the document to be an "expansion" of the agreement reached in August 2002, and expected that Johnston would either accept or reject the additional terms in the document.  (*Id.* pp. 190-92; 206-07.)[3]

Shortly after all of this, on March 19, 2004, Deleva, via an e-mail to Johnston, requested a temporary leave of absence with respect to his duties for the REMC Entities.  Deleva claimed: "As a direct result of resent (sic) developments related to our partnership discussions, I am requesting a temporary leave.  The stress and uncertainty surrounding these discussions and my future at REM have

---

[3] The document itself has not been produced to the Court, nor is there any indication in the record as to whether the document was ultimately signed by the parties. Deleva, however, has *not* asserted that Johnston ever signed the document.

5

adversely affected my ability to carry out my responsibilities to client and company."  (*Id.*,  Ex. 17.)  Johnston granted, by e-mail correspondence, temporary leave the same day.  (*Id.*)  Deleva asserts his temporary leave request was made pursuant to the FMLA.  In support, Deleva points to the fact that, approximately two weeks after he took leave, he began seeing a psychologist.  (*Id.* pp. 49-51.)  Over the course of a 12-month period, Deleva treated with the psychologist approximately eight to ten times.  (Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment, Ex. P.)

Johnston and the REMC Entities dispute that Deleva made his leave request pursuant to the FMLA.  In addition to denying FMLA leave was ever requested, or that proper notice with a "qualifying reason" was given, the defendants argue Deleva did not have a qualifying medical condition in the first instance since he was not under any medical care - or receiving any professional treatment whatsoever - at the time his temporary leave was sought.  (Deleva Dep. pp. 51-52, 285.)  The defendants again cite to Deleva's own deposition testimony, which confirms Deleva was never advised by a doctor or other health care professional that he was unable to perform the essential functions of his position prior to taking leave.  (*Id.*. pp. 51-54, 285, 288.)  Nor was Deleva ever told by a doctor or other healthcare professional, at any time, not to return to the workplace.  (*Id.* p. 59.)

The defendants further contend Deleva was performing the essential functions of his position, albeit remotely, while on temporary leave.  The defendants point to deposition testimony and e-mail correspondence indicating Deleva continued to perform the duties and responsibilities of a mortgage loan originator, even though physically absent from the office, including: contacting clients, originating requests for residential mortgage loans, undertaking the steps necessary to start and complete refinancing deals for clients, preparing (handwritten) good faith estimates for clients, and providing detailed instructions to his staff - by e-mail - on specific tasks.  (*Id.* pp. 290-303.)  The Plaintiffs

6

themselves assert Deleva, during his leave of absence, was able to direct loan and business transactions from Deleva's customers to the REMC entities, and that the processing of these transactions by REMC employees was beneficial to both Deleva and the REMC Entities.  (Amended Compl. ¶ 40.)[4]  Plaintiffs allege, nevertheless, that the defendants "refused" to permit Deleva to submit any further business or transactions to the REMC Entities after he took his temporary leave.  (*Id.* ¶ 42.)  They further contend Deleva was not performing other daily functions of his position, including training junior RLS professionals, networking with real estate brokers, and presenting Company products and services to potential customers.

On March 21, 2004, two days after Deleva submitted his leave request, Johnston attempted to clarify the request.  The attempt was prompted by a meeting the two men had earlier that day, wherein Deleva informed Johnston that resignation was a possibility and an option which "remained on the table."  (Deleva Dep. pp. 304, 310-11.)  Johnston advised Deleva, by e-mail later that day, that - because their meeting had ended abruptly - Deleva's request and intentions were "inconclusive;" therefore, Johnston needed further information.  (Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment, Ex. J; Notice of Deposition Duces Tecum for Plaintiff John Deleva, Ex. A.) Johnston's request for clarification was also based upon a lunch meeting Deleva had later that afternoon with several RLS professionals working for REMC, at least one of whom spoke with Johnston afterwards.  (Deleva Dep. p. 313.)  During the lunch, immediately after his meeting with Johnston, Deleva apparently advised the REMC employees he had left the company.  (Defendants' Motion for

---

[4] Deleva agrees the origination and closing of residential mortgage loan requests was his primary job responsibility at the REMC Entities, and that developing new business and processing loan applications were the essential functions of this responsibility.  (Deleva Dep., pp. 62, 290.)

Summary Judgment, Exhibit J; Deleva Dep. Ex. 24.)  Deleva, however, responded the next day to Johnston's request for further information by stating:  "I will be speaking with my advisors before the end of this week regarding my declared status at REM, for the time being I will remain on temporary leave as requested and approved earlier."  (Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment,  Ex. J; Notice of Deposition Duces Tecum for Plaintiff John Deleva, Ex. A.)  No further clarification was provided by Deleva, nor was there any mention of a medical concern.

On April 5, 2004, in response to a new mortgage transaction submitted by Deleva to REMC, Johnston informed Deleva that he - Johnston - believed Deleva had resigned based upon their meeting of March 21, 2004, and based upon the announcement Deleva had made to other REMC employees. (Deleva Dep., Ex. 23.)  Nevertheless, later the same day, Deleva denied resigning from the company and requested from the REMC Entities "all necessary forms and outline of procedures and guidelines associated with leave."  In his request, submitted three weeks after taking his temporary leave, Deleva mentioned - for the first time - that he was being treated by a doctor.[5]  (Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment, Ex. M.)  The REMC Entities, in response, informed Deleva his employment with the company had ended based upon the company's belief that Deleva had resigned as of March 21, 2004.  REMC, therefore, sent Deleva COBRA paperwork, which outlined the procedures for a continuation of medical benefits.  (Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment, Ex. O.)

Plaintiffs claim Deleva was wrongfully terminated while on FMLA leave and, further, that Deleva was not allowed to participate in the company's Short Term Disability program while on leave.

---

[5] Although Deleva first informed the REMC Entities, by this request, of a doctor's name and phone number, no further information was given nor was a medical condition or concern mentioned in his request for paperwork generally associated with "leave."

They also allege Mrs. Deleva was terminated shortly thereafter, solely in retaliation for her husband's exercise of his rights under the FMLA.

## II.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein . . . .  The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

The movant, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  *See*

9

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *see also White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The lack of such a response by the nonmoving party may result in an automatic grant of summary judgement. *See Reeves v. Fox Television Network*, 983 F.Supp. 703, 709 (N.D. Ohio 1997). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Fulson*, 801 F. Supp. 1 at 4.

## III.  DISCUSSION

The REMC Entities and Johnston articulate several reasons why they believe judgment as a matter of law is warranted in this case. With respect to the FMLA claims asserted by Mrs. Deleva, the

10

defendants assert Mrs. Deleva never requested, nor was she entitled to, FMLA leave.  Insofar as her claims are derivative of those asserted by her husband, the defendants argue such claims simply are not cognizable in this Court.  Even if a derivative claim was a valid means by which Mrs. Deleva could assert the rights and protections afforded under the FMLA, the defendants presumably believe it would make no difference based upon their theory of Deleva's own (underlying) FMLA claims.

The defendants' theory regarding Deleva's FMLA claims is that his leave request arose solely as a result of a personal dispute with Johnston, and had nothing to do with any medical condition.  The defendants argue the record establishes Deleva has not satisfied - and cannot satisfy - certain conditions precedent under the FMLA; therefore, he is not eligible for the benefits and protections of that Act.  Specifically, the defendants claim Deleva did not provide the REMC Entities with notice of a "qualifying medical condition" under the FMLA, and, further, that Deleva cannot establish such evidence in the first instance since he was not under any medical or professional care whatsoever when his leave commenced.  Alternatively, the defendants contend Deleva tendered his resignation on March 21, 2004, so that he was no longer an "eligible employee" for purposes of the FMLA at the time he claims he first suffered a qualifying medical condition (i.e., on March 30, 2004).

The defendants' arguments with respect to Deleva's claims under ERISA are similar.  They contend Deleva never established he was "disabled" for purposes of entitlement to benefits under REMC's short-term disability program.  The defendants further argue, once again, that Deleva tendered his resignation and was no longer an "eligible employee" at the time he presumably claims he first became "disabled."  Irrespective of any substantive ineligibility, the defendants claim Deleva failed to exhaust administrative remedies - a requirement under ERISA - by failing to submit a claim form "immediately" after becoming disabled, pursuant to the terms of REMC's employee benefits plan.

11

Finally, with respect to Deleva's breach of contract and promissory estoppel claims, the defendants' arguments can be summarized as this: there was no binding contract between Deleva and Johnston in August 2002, nor was there any "clear and unambiguous" promise for purposes of a promissory estoppel claim; therefore, any claimed reliance by Deleva on the proposal discussed in August 2002 - to which Deleva remained silent - would neither be foreseeable nor reasonable.

Plaintiffs have responded, in their Brief in Opposition, to most of these arguments - the exception being those relating to Mrs. Deleva's claims. Because the Court finds it can easily resolve the claims of Mrs. Deleva, the Court begins there.

**A)      Plaintiff Sherri Deleva**

In the Amended Complaint, Mrs. Deleva asserts a cause of action for wrongful termination in violation of the FMLA (Count Seven), and a cause of action for retaliation in violation of the FMLA (Count Eight). The defendants claim Mrs. Deleva's FMLA claims are purely derivative of those asserted by her husband. They correctly observe Plaintiffs have not argued - nor is there any evidence in the record - that Mrs. Deleva ever requested a leave of absence, or had any medical condition which would have prevented her from performing the functions of her position. Plaintiffs assert, rather, that Mrs. Deleva's employment with the REMC Entities was terminated solely as a result of her husband's leave of absence. Mrs. Deleva was, therefore, according to Plaintiffs, retaliated against because of her husband's assertion of FMLA rights. (Amended Compl. ¶¶ 77-78, 81.) Without pointing to any legal

12

authority, the defendants argue derivative FMLA claims are not actionable.[6]

Though the Court is inclined to agree with defendants on this substantive point, it need not reach the question of whether a derivative claim can <u>ever</u> be asserted under the FMLA.  As the defendants have pointed out in their Reply brief, Plaintiffs - for whatever reason - have chosen not to respond to the defendants' request for judgment as a matter of law on Mrs. Deleva's FMLA claims.  Having failed to come forward with any evidence to support her claims, or to establish that she suffered any harm stemming from those claims, the causes of action asserted by Mrs. Deleva under the FMLA (Counts Seven and Eight of the Amended Complaint) must be **dismissed with prejudice**.

---

[6]  Although the defendants have not provided any legal guidance on this issue, the Court briefly notes the case of *Knussman v. State of Maryland*, 935 F. Supp. 659 (D. Md. 1996).  In that case, the wife of a state police officer brought a derivative action against the State of Maryland on the grounds that her husband was unlawfully deprived of the right to parental leave following the birth of his daughter.  The court found the wife had no standing to bring an FMLA claim where the violations alleged to have occurred, and the damages claimed, did not implicate the wife's individual statutory rights, but, rather, arose indirectly as a result of the State's actions against her husband.  In doing so, the court rejected the wife's argument - asserted under an "intended beneficiary" theory - that the FMLA's purpose would be thwarted if she was not entitled to bring suit for the injuries she suffered that were fairly traceable to the State's violation of the FMLA.  The court specifically noted:

> Previous cases that have addressed the availability of § 1983 actions to redress federal statutory violations by state actors have involved statutes that do not contain a private right of action. Here, however, because the FMLA gives an affected employee a private right of action against his employer, it is clear that while Congress sought to benefit the family unit, it did not intend to give other family members a right of private enforcement as well.
>
> * * *
>
> Accordingly, the FMLA does not create enforceable rights on the part of family members of affected employees for injuries suffered as a result of an employer's failure to comply with the Act.

*Knussman*, 935 F. Supp. at 667.

13

**B)** **Plaintiff John Deleva**

Having found Mrs. Deleva cannot proceed on her derivative FMLA claims, the Court next addresses whether there are any viable FMLA claims as to Deleva - who asserts both "interference" and "retaliation" claims under the FMLA.

The FMLA prohibits an employer from interfering with, restraining, or denying an employee's exercise of the employee's rights under the FMLA. *See* 29 U.S.C. § 2612(a)(1)(D). If an employer interferes with the employee's right to the leave, the deprivation of the right is a violation of the FMLA regardless of the employer's intent. *See Smith v. Diffee Ford-Lincoln-Mercury*, 298 F.3d 955, 960 (10th Cir. 2002), *citing King v. Preferred Tech. Group*, 166 F.3d 887, 891 (7th Cir. 1999). There are two types of claims which can arise from a deprivation of FMLA rights: interference and retaliation. *See Carmen*, 295 F. Supp. 2d at 813; *see also Bickley v. FMC Technologies*, 2003 U.S. Dist. LEXIS 9489 at *16 (N.D. Ohio 2003). While a claim of retaliation is not expressly provided for on the face of the statute:

> [I]nherent within the exercise of the right to leave under the FMLA is that an employer cannot later use that leave against the employee. By doing so, the employer interferes with the ongoing protections that accompany the right - protections that are part *prescriptive* in that the employer must afford the employee the right to be free from retaliation, as well as part *proscriptive* in that an employer cannot penalize an employee for invoking this or other FMLA rights.

14

*Welty v. Honda of Am. Mfg., Inc.*, 411 F. Supp. 2d 824, 829 (S.D. Ohio 2005) (emphases in original).[7]

The defendants' arguments suggest that the viability of Deleva's FMLA retaliation claim may hinge upon the viability of his interference claim. Accordingly, the Court first discusses Deleva's FMLA interference claim.

### 1. **FMLA Interference**

In Count One of the Amended Complaint, Plaintiffs allege, *inter alia*, that defendants violated the FMLA by terminating Deleva's leave of absence and/or his employment, by refusing to continue and/or terminating Deleva's group medical insurance coverage, by refusing to allow Deleva to participate in company benefits during his leave, and by denying him the opportunity to return to his job or an equivalent job. In their Brief in Opposition, Plaintiffs focus solely on Deleva's separation from employment as the act giving rise to Deleva's FMLA claims. Plaintiffs' arguments regarding the denial of employee benefits are presented strictly in the context of an ERISA claim. The Court will, therefore, assume it is the termination of Deleva's leave of absence and his separation from employment with the REMC Entities (without the opportunity to return to an equivalent position) which are the primary bases for Deleva's FMLA interference claim.

To prevail on his interference claim, Deleva must establish: (1) he is an eligible employee under 29 U.S.C. § 2611(2); (2) the defendants are "employers" as defined by 29 U.S.C. § 2611(4); (3) he was

---

[7] This is in line with other federal courts that have identified two types of claims under the FMLA: (1) those which are *prescriptive* in nature, and relate to a denial of leave (also referred to as the "entitlement" or "interference" theory, which establishes entitlements to employees and sets a floor for employer conduct); and, (2) those which are *proscriptive* in nature, and relate to an adverse employment action alleged to be the result of requesting FMLA leave (the "retaliation" or "discrimination" theory, which prohibits disparate employer conduct with regard to employees taking leave). *See Walker v. Elmer County Bd. of Educ.*, 379 F.3d 1249 (11th Cir. 2004); *see also Sosby v. Miller Brewing Co.*, 415 F. Supp. 2d 809 (S.D. Ohio 2005) (citing *Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238 (6th Cir. 2004)).

15

entitled to leave under the FMLA; (4) he gave the defendants notice of his intention to take leave; and, (5) the defendants denied him FMLA benefits to which he was entitled.  *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 720 (6th Cir. 2003).  The disputed elements in this case, as briefed by the parties, are whether Deleva gave proper notice of an FMLA-qualifying event, and whether Deleva was entitled to leave under the FMLA for a serious health condition.  Secondarily, the defendants claim Deleva cannot establish he was an "eligible employee" at the time he claims a serious medical condition arose due to what the defendants have classified as Deleva's resignation.

The FMLA provides eligible employees with up to twelve weeks of leave during any calendar year to care for, among other things, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  Under 29 U.S.C. § 2611(11), a "serious health condition" is defined as an illness, injury, impairment, or physical or mental condition that involves:

>    (A)    Inpatient care in a hospital, hospice, or residential medical care facility; or
>
>    (B)    Continuing treatment by a health care provider.

The phrase "functions of the position of such employee" is defined to mean the "essential functions" of the employee's position.  29 C.F.R. § 825.115.

In this case, the record does not contain any evidence, nor do Plaintiffs argue, that Deleva received inpatient care in a hospital, hospice, or residential medical care facility.  Plaintiffs are proceeding, rather, on a theory that a serious medical condition causing Deleva to be unable to perform the essential functions of his position is reflected by his continuing treatment with a psychologist.  On this point, guidance is supplied by 29 C.F.R. § 825.114(a), which explains:

16

(2)     ... A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

(i)      A period of incapacity (i.e., inability to work, attend school or perform other regular activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A)     Treatment two or more times by a health care provider ... ; or

(B)     Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

Accordingly, Deleva must demonstrate he was incapacitated for a period of at least three days *and* either was treated two or more times by a health care provider, or was treated on at least one occasion by a health care provider resulting in a regime of continuing treatment under the supervision of the health care provider. *See Olsen v. Ohio Edison Co.*, 979 F. Supp. 1159, 1164 (N.D. Ohio 1997, O'Malley, J.) ("The ... regulations thus require a plaintiff to make a two-pronged showing of *both* an incapacity requiring absence from work *and* continuing treatment."); *Bond v. Abbott Lab*, 7 F. Supp. 2d 967 (N.D. Ohio 1998, Gwin, J.) (citing to *Olsen* for the same proposition).

To invoke the protections of the FMLA, moreover, Deleva must first provide notice and a qualifying reason for requesting the leave. *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998) (citing *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 762 (5th Cir. 1995)).  An employee need not expressly assert rights under the FMLA, or even mention the FMLA in the leave request.  29 C.F.R. § 825.302.  The request, nevertheless, must be sufficient to make the employer aware that the leave is FMLA-qualifying.  *Brock v. United Grinding Techs.*, 257 F. Supp. 2d 1089, 1199 (S.D. Ohio  2003)

17

(citing *Chandler v. Specialty Tires of Am.*, 283 F.3d 818, 825 (6th Cir. 2002)).  In this case, there is no dispute that some form of temporary leave was requested by Deleva.  The defendants argue, however, that this fact is irrelevant to the issue of whether or not Deleva properly requested - and was entitled to - leave *under the FMLA*.

Defendants first criticize the notice provided by Deleva by claiming Deleva's request for a temporary leave of absence was the result of Deleva's ongoing dispute with Johnston, and not the result of any existing medical condition.  The leave request, on its face, seems to indicate that Deleva's need for some time away from the office was solely for personal reasons; specifically, a temporary leave of absence appears to have been requested so that Deleva could come to terms with his perceptions and feelings regarding the failed partnership discussions.  Deleva expressly stated temporary leave was being requested "[a]s a direct result of resent (sic) developments related to our partnership discussions." (Deleva Dep. Ex. 17.)  The request never mentioned any existing medical treatment, any contemplated medical treatment, or even a medical condition or concern.  It merely reflected, instead, that Deleva was experiencing "stress and uncertainty" over a business deal that went sour, and that Deleva was questioning his future with REMC.  Plaintiffs expressly acknowledge, in their Brief in Opposition, that the leave request was "a consequence of the stress from the failed deal." (Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment, p. 2.)  They do not claim the leave request was a consequence of a diagnosed medical condition, or a consequence of the stress of working under a medical condition; nor do they provide any argument (or evidence) that the stress Deleva claims to have experienced following the collapse of the business negotiations rose to the level of a diagnosed medical condition.

While it is true an employee need not expressly mention the FMLA when requesting a leave of

18

absence, the employee must give the employer "enough information for the employer to reasonably conclude that an event described in FMLA [§ 2612(a)(1)(D)] has occurred." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999); *see also* 29 C.F.R. § 825.302. "The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious medical condition." *Garraway v. Solomon R. Guggenheim Found.*, 415 F. Supp. 2d 377, 383 (S.D.N.Y. 2006) (citing *Manuel v. Westlake Polymers, Corp., supra*). *Only if* the employee provides adequate notice will the burden shift to the employer to further inquire and obtain any additional required information, such as a medical certification, to determine if the leave should be classified as FMLA leave. 29 C.F.R. §§ 825.301, 825.305.

Here, Plaintiffs do not point to any evidence in the record that Deleva ever mentioned *any* type of medical or professional treatment until his belated request to human resources, made three weeks after beginning his temporary absence, for the forms necessary for "leave" - which identified, for the first time, contact information for a doctor. Again, however, there was no mention of any medical condition or concern. Indeed, before the request for paperwork, when Johnston attempted to clarify Deleva's leave request, the only response he received was that Deleva would be "speaking to his advisors" before the end of the week and would, in the meantime, remain on temporary leave as requested and approved. (Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment, Ex. J; Notice of Deposition Duces Tecum for Plaintiff John Deleva, Ex. A.)

Until Deleva's request for paperwork, there was absolutely nothing in Deleva's prior statements which would apprise the defendants that Deleva's leave was anything more than a personal request. They were not, therefore, required to read between the lines and seek additional information from Deleva under the FMLA. Under such circumstances, the termination of Deleva's leave of absence, and

his employment, was not interference with any rights protected by that Act.[8]

Assuming, *arguendo*, Deleva's temporary leave request *could be* construed as alerting his employer to a potentially FMLA-qualifying event, this allowance still does not help him.  This is because Deleva has not demonstrated an incapacity for a consecutive period of more than three days, requiring absence from work, which is the *threshold* requirement for finding a serious health condition under 29 C.F.R. § 825.114(a).  "Indeed, it is only where an incapacity is shown that the Court need

---

[8] *See, e.g., Peeples v. Coastal Office Prods., Inc.*, 203 F. Supp. 2d 432 (D. Md. 2002) (Employee who claimed to suffer from symptoms of depression did not provide adequate notice to his employer and, thus, could not maintain a claim for wrongful discharge in violation of the FMLA where the employee, after being treated Friday evening by the psychiatrist on duty in an emergency room for depressive disorder, was released the same day with a "work excuse" stating the employee's primary care physician would determine a return to work date, but that the employee had no work restrictions.  The employee called his employer the following Monday to report he was sick, unable to perform his duties, and could not return to work until he saw his primary care doctor later that week.  The employee also provided the work excuse from the ER, but never provided any information regarding a diagnosis or prognosis; therefore, the notice was insufficient to invoke the employer's duties under the FMLA, and the employee was not entitled to job protection); *Collins v. NTN-Bower Corp.*, 272 F.3d 1006 (7th Cir. 2001) (Even assuming the plaintiff's claimed depression was "clinical depression," which the court found would constitute a serious health condition, the plaintiff did not adequately notify her employer of the need for an FMLA-qualifying leave because the employee had not stated she was suffering from symptoms of depression - a condition which she had mentioned to her employer a year prior - but only that she was "sick."); *Gay v. Gilman Paper Co.*, 125 F.3d 1432 (11th Cir. 1997) (Employee who suffered a nervous breakdown had her husband call her employer to report she was in the hospital and having "tests" performed.  This did not signal to the employer that the employee's condition was potentially FMLA-qualifying; therefore, the burden was not shifted to the employer to determine if the employee's absence should be classified as leave under the FMLA, and the employee's termination did not violate the FMLA); *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973 (5th Cir. 1998) (The plaintiff, who attempted to take FMLA leave for a sudden medical condition by delivering a note to her employer stating she was having "a lot of pain in her side" and could not work, did not provide her employer with the type of notice that would require the employer to seek additional information regarding her condition.); *Niese v. Gen. Elec. Co.*, 2001 WL 290382 (S.D. Ind. Jan. 31, 2001) ("Knowledge that an employee has depression and that she had taken a prior leave of absence is insufficient to put an employer on notice that a request for leave for 'Personal Problems & Child care issues' is really a request for leave because of a serious health condition of the employee that makes her unable to perform her job.").

20

proceed to a consideration of whether the employee received 'continuing treatment' within the meaning of the Act." *Olsen*, 979 F. Supp. at 1164. Although the Court's inquiry is over and summary judgment appropriate where a plaintiff cannot demonstrate an incapacity, Deleva's failure on this point is intertwined with his burden of showing an inability to perform the essential functions of his position - a burden which Deleva has likewise failed to meet. The Court, therefore, analyzes the evidence in the record on each of these points together.[9]

The record in this case discloses no report, affidavit, deposition testimony, or other evidence from a health care provider establishing Deleva was incapacitated (*i.e.*, unable to work or perform any other regular activities) for a period of more than three consecutive days - or even that he was unable to perform the "essential" functions of his position as a mortgage loan originator during his absence. The Court, therefore, is left only with Deleva's own deposition testimony.

Looking at the evidence in a light most favorable to Deleva, it is clear as a matter of law the FMLA is not applicable to his claimed injury. At best, Deleva claims: "I would say that [the psychologist] confirmed what I was experiencing and understood how that impacted my ability to do my job." (Deleva Dep. p. 57.) Although Deleva was "convinced that [the psychologist] appreciated

---

[9] The parties attempt to support their respective positions regarding whether Deleva had a serious medical condition by focusing on the timing of Deleva's treatment. The defendants argue Deleva cannot satisfy the "continuing treatment" requirement because he had not sought any treatment *prior* to his leave request, which they claim must be part of any "continuing treatment." Plaintiffs, without expressly stating so, presume there is no requirement that an employee fulfill any part of the "continuing treatment" element prior to seeking leave. Neither party, however, directs the Court to any legal support for their positions. While it appears there is no requirement in the law that an employee already have received medical treatment at the time the employee gives notice, the Court need not reach that issue given its other conclusions. *See, e.g., George v. Associated Stationers*, 932 F. Supp. 1012 (N.D. Ohio 1996); *see also Stubl v. T.A. Sys., Inc.*, 984 F. Supp. 1075 (E.D. Mich. 1997) (citing *George* in holding "[t]he FMLA does not require that the employee must have received medical treatment at the time he gave notice.").

21

and understood my mental state," he never identified any diagnosis or prognosis made by the psychologist or any other health care professional.  (*Id.* p. 58.)  When again pressed on this issue, Deleva merely repeated: "I believe that [the psychologist] felt that my ability to conduct business was affected by what I had represented to him and his observations."  (*Id.* pp. 287-88.)  This is vastly different from an employee who is incapacitated for more than three consecutive days, receives a professional diagnosis that the employee is unable to perform the essential functions of a particular position, and receives an instruction from a health care professional to remain absent from work.  On these points, Deleva *repeatedly agreed* no such diagnosis or instruction was given.  (*Id.* pp. 51-54, 59, 285, 288.)  Indeed, Deleva conceded his psychologist never told him not to go back to work.  (*Id.* p. 59.)

Deleva carries the burden of demonstrating he was incapable of work for more than three consecutive days at the time he requested leave, yet nothing in the record confirms this; indeed, the record clearly refutes it.  It is undisputed that Deleva was able to meet with Johnston at his office two days after his temporary leave commenced, and was further able to attend a lunch meeting with other RLS professionals later in the day.  (*Id.* pp. 304, 310-11, 313.)  There is also no doubt Deleva was capable of performing, at a minimum, many of his primary job functions.  Deleva testified that the origination and closing of residential mortgage loan requests was his primary job responsibility at the REMC Entities, and that developing new business and processing loan applications were the essential functions of this responsibility.  (*Id.* pp. 62, 290.)  The record demonstrates Deleva was doing precisely this from his home.  The Plaintiffs themselves admit that, during his leave of absence, Deleva was able to direct loan and business transactions from his customers to the REMC entities.  (Amended Compl. ¶ 40.)  There is simply nothing in the record to explain why Deleva could not similarly perform these primary duties at the office.

22

More importantly, however, just as an expert's testimony that a medical condition simply "is so" is not admissible,[10] neither is Deleva's own opinion - standing alone - sufficient to establish his absence from work was medically necessary to treat his condition.[11] An employee's own testimony that he is too sick to work does not constitute a medical opinion as a matter of law.[12]  While neither party has cited to 29 C.F.R. § 825.114(c), it provides, in part: "[m]ental illness resulting from stress or allergies may be serious health conditions, but only if all the conditions of this section are met." Noticeably absent from the discussion of "serious health conditions" contained in that subsection is any

---

[10] *See Boyd v. State Farm Ins. Co.*, 158 F.3d 326 (5th Cir. 1998)(deeming inadmissible the affidavit testimony of plaintiff's expert witness where it contained nothing more than the expert's credentials and the *subjective* opinion that the plaintiff was "unable to perform his job.")

[11] The plaintiff bears the burden of proving the *objective existence* of a serious health condition that incapacitated the plaintiff during the period in question, and the determination as to whether plaintiff has established a serious health condition is a question of law.  *Whitworth v. Consol. Biscuit Co.*, 2007 WL 1075774, *8 (E.D. Ky., Apr. 6, 2007) (Slip copy) (citing *Hornbuckle v. Detroit Receiving Hosp. & Univ. Health Ctr.*, 407 F. Supp. 2d 853 (E.D. Mich. 2005); *see also Carter v. Rental Unif. Serv. of Culpeper, Inc.*, 977 F. Supp. 753, 761 (W.D. Va. 1997) ("Determining whether an illness qualifies as a serious health condition for purposes of the Family and Medical Leave Act is a legal question that a plaintiff may not avoid simply by alleging it to be so."); *Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 499 (7th Cir. 1999) ("Whether an illness or injury constitutes a serious health condition under the FMLA is a legal question that an employee may not sidestep in the context of summary judgment merely by alleging his condition to be so.").

[12] *See, e.g., Brannon v. OshKosh B'Gosh, Inc.*, 897 F. Supp. 1028 (M.D. Tenn. 1995) (Employee's gastroenteritis and upper respiratory infection did not constitute "serious health condition" covered by the FMLA since, although employee saw physician and was given three prescription medications, there was no proof that she was incapacitated for more than three calendar days.  Although employee stayed home from work more than three days, her own testimony that she was too sick to work was insufficient to prove that her absence was necessary.); *see also Haefling, supra* (After observing that the plaintiff did not submit an affidavit from his own doctor or any other medical professional demonstrating the "necessity" of his physical therapy treatments, the court held the plaintiff's own "self serving assertions regarding the severity of his [neck injury] and the treatment it required" were insufficient as a matter of law to raise an issue of fact.).

23

mention of "stress" in and of itself, rather than as a precursor for a mental impairment.  Deleva does not contend, nor does the record indicate, that he suffers from any mental illness resulting from his claimed stress.  As this Court previously stated in *Olsen*, Congress did not intend "[t]he slings and arrows of everyday life ... to be the stuff of a federal statute, nor federal litigation based on it." *Olsen*, 979 F. Supp. at 1163.  The mere incantation of the word "stress" - as presented *in this case* - does not create a federal case.  Instead, the types of illnesses Congress had in mind are reflected in the legislative history:

> heart attacks, heart conditions requiring heart bypass of valve operations, *most* cancers, back conditions requiring *extensive therapy or surgical procedures,* strokes, *severe* respiratory conditions, spinal injuries, appendicitis, pneumonia, emphysema, *severe* arthritis, *severe* nervous disorders, injuries caused by *serious* accidents on or off the job, ongoing pregnancy, miscarriages, complications or illnesses related to pregnancy, such as *severe* morning sickness, the need for prenatal care, childbirth and recovery from childbirth.

H.R.Rep. No. 8, 103rd Cong., 1st Sess., pt. I at 29 (1993) (emphases added).  Federal courts, therefore, have repeatedly required proof of *serious* illnesses only.[13]

---

[13] *See, e.g., Whitworth, supra* (Employee claiming entitlement to FMLA leave did not establish a serious medical condition where her alleged incapacity was due to anxiety and stress in connection with the release of her ex-boyfriend from jail.  Employee did not demonstrate an inability to work or perform regular daily activities; therefore, her discharge, even after completing an FMLA leave slip and providing a medical certification that suggested taking a few weeks off due to stress and anxiety, did not violate the FMLA); *Boyd, supra* (Employee's leave of absence, purportedly for stress and anxiety, did not constitute protected leave under the FMLA where, despite employer approving FMLA leave, the testimony of employee's treating physicians failed to support employee's claim of incapacity and employee's own expert witness, a non-treating physician hired two years after the fact, offered nothing more than an unsupported conclusion that the employee was "unable to perform his job."); *Bailey v. Augustine Med., Inc.*, 2003 WL 288470 (D. Minn. Feb. 7, 2003) (Employee granted leave after his psychiatrist suggested he take time off for stress did not have a valid claim under the FMLA after his employment was terminated for failure to report, which was classified as a resignation based upon employee's prior statements, because the court found "stress does not rise to the level of a serious medical condition."  The employee's notice to the employer, moreover, was simply that

Plaintiffs point to *Swanson v. Senior Res. Connection*, 254 F. Supp. 2d 945 (S.D. Ohio 2003), for their broad contention that:

> Where an employee must be absent from work to receive medical treatment for a serious health condition, that employee is considered to be unable to perform the essential functions of the position during the absence for treatment.

*Id.* at 951 (citing 29 C.F.R. § 825.115).  In citing to this general statement, Plaintiffs neglect to mention that, unlike here, the employee in *Swanson* had a medical diagnosis of depression, a professional opinion that the employee was substantially limited in her ability to sleep and work, a prescription for medication, and *an instruction to remain absent from work for two weeks*.  What Plaintiffs are attempting to do here is conflate Deleva's (un-advised) absence from work into evidence of a serious medical condition and an inability to perform the essential functions of his position.  There simply is nothing in the record, or in any legal authority cited, to support Plaintiffs' theory.

The bottom line is Deleva has not come forward with any medical evidence that his claimed inability to work was *because of* a diagnosed condition - rather than a desire to avoid a potentially uncomfortable workplace.  Without establishing an incapacity, he is unable to show he suffered from a "serious medical condition."  It is simply insufficient for an employee to testify that, in his or her own judgment, he or she should not work while receiving psychological treatment, or even that it was uncomfortable or inconvenient to work while receiving this treatment.  *Olsen*, 979 F. Supp. at 1166.  The FMLA contemplates, rather, that a health care provider has determined, in his or her professional medical judgment, the employee is unable to work because of a serious medical condition.  "If it were otherwise, a note from a spouse, parent, or even one's own claim that one cannot work because of

---

he was going to see a psychiatrist for anxiety and stress, and the note from his doctor indicated his treatment did not occur until five days after his termination.).

illness would suffice." *Id.*

Deleva has been allowed the benefit of three years since he filed his original Complaint to come forward with evidence that a *health care provider* instructed, recommended, or at least authorized him not to work for a minimum of three consecutive days - either by affidavit, deposition, or other testimony of a health care provider.  Deleva's failure to do so, combined with the lack of adequate notice to his employer of an FMLA-qualifying event, leaves the Court with no choice but to dismiss with prejudice his claim for interference with rights protected under the FMLA (Count One of the Amended Complaint).[14]

### 2. **FMLA Retaliation**

In Count Two of the Amended Complaint, Plaintiffs assert:

> 33. As a result of John Deleva's Leave of Absence, and/or his request to invoke his rights pursuant to the Family and Medical Leave Act, the Defendants knowingly retaliated against him.

> 34. The retaliation included, but is not limited to, termination of John Deleva's employment, denial of benefits, denial of the opportunity to return to his job or an equivalent job, termination of his group medical insurance coverage, termination of Sherri Deleva's employment, and termination of all other employees of the Deleva Group.

Defendants first assert, in a brief paragraph, that there is no basis for an FMLA retaliation claim where an employee cannot demonstrate he "availed himself of a right that is protected by the FMLA." Plaintiffs, without citing any legal support, presume the opposite - that an FMLA retaliation claim can survive even in the absence of a valid, underlying right to FMLA benefits.  Plaintiffs do so by claiming

---

[14] The Court's conclusions obviate the need for a discussion of the defendants' alternative argument regarding eligibility - namely, that Deleva was not an "eligible employee" at the time he claims he first suffered a serious medical condition (on March 30, 2004) as a result of his purported resignation nine days earlier.

26

there are genuine issues of fact regarding whether the defendants "knew of the leave request,"[15] and

whether they terminated Deleva because he exercised, or attempted to exercise, rights under the FMLA.

In the context of his FMLA retaliation claim, Deleva must show: (1) he availed himself of a

protected right under the FMLA; (2) the defendants knew of Deleva's exercise of a protected right; (3)

Deleva was subjected to an adverse employment action; and, (4) there was a causal connection between

the exercise of the protected right and the adverse employment action. *Canitia v. Yellow Freight Sys.,*

*Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990); *Arban v. West Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir.

2003).  Deleva can, of course, meet his burden of proof by demonstrating the defendants intentionally

retaliated against him by discharging him solely because of his exercise of a protected FMLA right.

*Spurlock v. Peterbilt Motors Co., Inc.*, 58 Fed. Appx. 630 (6th Cir. 2003).  In the absence of direct

evidence of the defendants' intent to retaliate, however, Deleva may use the burden-shifting framework

employed in Title VII discrimination cases to establish a prima facie case of FMLA retaliation.  *See*

*Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001).

In this case, Plaintiffs have not cited to any *direct* evidence of retaliation on the basis of a

medical leave; therefore, the circumstantial evidence analysis of *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973) applies.  Although neither party addresses the elements of a circumstantial

evidence case, the defendants appear to acknowledge this framework applies since they have offered

a legitimate, business reason for Deleva's separation from employment (*e.g.*, their belief that Deleva

resigned from his position).  Before beginning a *McDonnell Douglas* analysis, however, the Court must

---

[15] While Plaintiffs continuously assert that defendants were aware "of the leave request" and/or "granted the leave request," this knowledge does not equate to a finding that the defendants knew Deleva was asserting a leave request *under the FMLA - i.e.*, that he was attempting to exercise a *protected right* rather than a personal option.

turn to the threshold question raised by the defendants' primary argument; namely, whether Deleva's claim for retaliation can survive in the first instance without an underlying protected activity.  Neither party provides legal guidance on this issue.

There does appear to be a substantial body of case law which supports the general argument that an employee who is "ineligible" for FMLA leave does not engage in statutorily protected activity and, therefore, does not have a basis for asserting an FMLA retaliation claim.[16]  While the majority of these cases deal with the FMLA's basic eligibility criteria of twelve-months of employment and 1,250 hours of service prior to the date of the requested leave, the Sixth Circuit has addressed a related procedural issue: whether an employee can maintain a retaliatory discharge claim under the FMLA where the employee has no entitlement to FMLA rights because the employer employs less than fifty individuals.  *See Humenny v. Genex Corp., Inc.*, 390 F.3d 901 (6th Cir. 2004).  The plaintiff in that case conceded she was ineligible for FMLA leave as a result of the small size of her employer's workforce, but

---

[16] *See, e.g., Walker v. Elmore County Bd. of Educ.*, 379 F.3d 1249 (11th Cir. 2004) (The court of appeals rejected the district court's holding that the FMLA can protect someone who mistakenly asks for FMLA leave, although they are ineligible.  The court of appeals held that a request for maternity leave that did not meet the FMLA's eligibility criteria - both at the time of the request and at the time the leave was to start - did not constitute a "protected attempt" to obtain an FMLA benefit.  The plaintiff's retaliation claim, therefore, failed in the first step of the analysis because the employee did not attempt to exercise, or engage in, a statutorily protected activity); *Williemssen v. The Conveyor Co.*, F. Supp. 2d 813 (N.D. Iowa 2005)(Because the plaintiff was not an "eligible employee" on the date her leave commenced, she was not entitled to the protections of the FMLA even though her leave extended beyond the end of the twelve-month eligibility period.  Accordingly, the employer did not act contrary to the FMLA when it terminated her employment based upon the taking of excessive leave because none of the leave was covered by the FMLA); *Shafniski v. Bell Atlantic, Inc.*, 2002 WL 31513551 (E.D. Pa. Nov. 5, 2002)("A plaintiff who is an ineligible employee under the FMLA [because the plaintiff did not meet the 1,250 working hours requirement] would not be engaging in statutorily protected activity in pursuing leave under that statute."); *Pennant v. Convergys Corp.*, 368 F. Supp. 2d 1307 (S.D. Fla. 2005)("[A]n employee who is ineligible for FMLA leave [because the employee did not meet the 1,250 working hours requirement] does not have a valid cause of action for retaliation under the FMLA.").

28

maintained she was demoted and eventually dismissed for "attempting" to assert rights which she, *in good faith*, believed she was entitled to under the FMLA.  *Id.* at 904-05.  The plaintiff argued she should be able to assert an FMLA retaliation claim in this situation.  The Sixth Circuit disagreed, holding:

> Appellant argues that the statute's use of the words "employee" and "individual" indicates that these retaliation provisions apply regardless of whether an employee is eligible for leave under the statute.  However, a close reading of the statute reveals that the retaliation provisions prohibit employers from retaliating based on the exercise of a "right" under the statute.  The regulations provide similar protection by prohibiting retaliation based on the exercise of "any rights provided by the Act."  29 C.F.R. § 825.220(a)(1).  Because Appellant is not an eligible employee, Appellant has never exercised or attempted to exercise any "rights" provided to her by the FMLA.
>
> * * *
>
> The Court finds that the FMLA's "eligible employee" requirement applies in all FMLA cases, including retaliation cases.  Accordingly, Appellant has failed to state a [retaliation] claim under the statute.

*Id.* at 905-06.

In each of the situations described above, the plaintiffs were attempting to extend the FMLA's reach where Congress had expressly limited the Act's coverage (so as to exclude short-term or part-time employees, and small employers).  Such extensions would clearly be at odds with the plain language of the FMLA.  Although the Court has not declared Deleva "ineligible" on similar grounds, it has found that his FMLA claim is <u>both</u> procedurally and substantively flawed.  The Court has found that Deleva never even notified his employer of a potentially FMLA-qualifying event.  Faced with FMLA ineligibility as a result of the employee's failure to notify the employer of the need for a potentially FMLA-qualifying leave, and/or to establish a serious medical condition, other courts have barred resort to an FMLA retaliation claim.

29

In *Schmittou v. Wal-Mart Stores, Inc.*, 2003 WL 22075763 (D. Minn. Aug. 22, 2003), for instance, the court found the plaintiff ineligible for FMLA benefits for the same two reasons presented here. First, the plaintiff in *Schmittou* failed to put the employer on notice of a potentially FMLA-qualifying event when she requested time off to care for her "sick" infant daughter. *Id.* at *6. Second, the infant's illness, gastroenteritis, was found not to be a "serious medical condition" sufficient to give rise to FMLA rights and benefits for the mother. *Id.* The court held that, because the employee was not eligible for leave under the FMLA, "it was impossible for her to engage in any activity protected by the statute." *Id.* at *7. Here, there is no basis for distinguishing Deleva from the plaintiff in *Schmittou. See Rogers v. Bell Helicopter Textron, Inc.,* 2000 WL 1175647 (N.D. Tex. Aug. 17, 2000) (The plaintiff's "retaliation claim fails under the *McDonnell Douglas* framework because the Court has already found that [the plaintiff] did not suffer from a 'serious health condition' and, therefore, was not entitled to FMLA leave."); *Whitworth v. Consol. Biscuit Co.*, 2007 WL 1075774, slip op., at *10 (E.D. Ky. April 6, 2007) ("Accordingly, viewing the facts in the light most favorable to the Plaintiff, Whitworth has failed to present evidence to support her claim that she was incapacitated within the meaning of the FMLA." Reasoning: "Because Whitworth cannot survive this 'threshold consideration' under the FMLA, she has failed to establish that she was entitled to FMLA leave or that she was engaged in an FMLA protected activity. Thus, the Defendants are entitled to judgment on her claims for interference and retaliation under 29 U.S.C. § 2615.").

While the Court is not prepared to say that FMLA retaliation claims can never be asserted in the absence of the successful assertion of an interference claim under the Act, it does find that Deleva's retaliation claim fails. Specifically, the Court finds that where, as here, a plaintiff's FMLA claim fails because the plaintiff has failed to meet the most basic eligibility criteria under the FMLA - *i.e.*,

notification of a claim *and* the existence of a serious medical condition - no retaliation claim can stand.

The Court finds, moreover, that summary judgment on Deleva's FMLA retaliation claim is warranted in any event because, as a matter of law, there is no evidence that the defendants' actions were retaliatory.  First, Deleva has failed to prove a crucial element of his prima facie case of FMLA retaliation; namely, that the defendants were aware he was exercising a protected right.  As discussed at length earlier in this Opinion, there simply was no indication to the defendants - at the time of Deleva's request on March 19, 2004 - that he was attempting to take a leave of absence *under the FMLA*.  Any potential indication of a leave of absence for professional treatment did not come until - at the earliest - April 5, 2004, when Deleva requested paperwork associated with "leave" and, for the first time, provided the name and number for a doctor.  This was approximately three weeks after he began his leave of absence, and the request was directed to *human resources* rather than to a *decision maker*, such as Johnston, for purposes of a retaliation claim.  By that time, however, Deleva's separation from employment was already  complete.  Which brings the Court to the second reason Deleva has failed to demonstrate how the defendants' actions were retaliatory.

Deleva's request for paperwork associated with leave, which - conceivably - was the first indication of any medical or professional treatment, came approximately three weeks *after* Deleva advised Johnston that resignation was a possibility and an option which "remained on the table." (Deleva Dep. pp. 304, 310-11.)  While Deleva may dispute the true nature of his intentions, and may even have attempted to retract or negate this statement at a later date, he has not produced summary judgment evidence sufficient to show that Johnston did not have a good faith basis for taking Deleva's statement for what it was.  Deleva has shown nothing - in his Opposition or by way of documentary evidence - to indicate the defendants' articulated business reason for the discontinuation of his

employment was - in fact - a *pretext for FMLA retaliation*, rather than a belief, correct or not, that Deleva had resigned, and had announced that fact publicly.

For all of these reasons, the Court finds the defendants are entitled to judgment as a matter of law on Deleva's claim of FMLA retaliation (Count Two of the Amended Complaint), and this claim is dismissed with prejudice.

### 3.  **ERISA claims**

In Counts Five and Six of the Amended Complaint, Plaintiffs allege Deleva was wrongfully denied group medical insurance coverage and disability benefits while on leave in violation of ERISA. In support,  Plaintiffs have produced billing statements from Deleva's psychologist indicating that defendants' health insurance carrier denied payment for seven therapy sessions between March 2004 and July 2004.  There is no such documentary evidence with respect to Plaintiffs' claim that Deleva was denied short- and/or long-term disability benefits.  This is because there is no question Deleva never submitted a disability claim form pursuant to the terms of REMC's disability benefits program. Plaintiffs claim, however, that any such attempt would have been "futile."

The Plaintiffs first cite to the FMLA, specifically, Section 2614(c)(1), in arguing the defendants were required to maintain Deleva's group health insurance and disability plan benefits following his absence from the workplace.  The insurance carrier's rejection of Deleva's medical bills after March 21, 2004, on the basis that Deleva's employment had ended as of March 21, 2004, was, therefore, according to Plaintiffs, a violation of that Act.  The defendants counter this argument with documentary proof that COBRA (continuation of benefits) was offered to Deleva following his separation from employment; however, Plaintiffs contend this is a "clear" departure from the requirement - under the FMLA - that an employer continue benefits "of the same level and same conditions" during a medical

leave of absence.  The Court has already determined Deleva was not entitled to any of the rights and protections afforded under the FMLA.  The FMLA is, therefore, not a valid predicate for Deleva's "denial of health benefits" claim.

Plaintiffs next contend Deleva lost the right to receive short- and/or long-term disability benefits when he was terminated in violation of 29 U.S.C. § 1140 (typically referred to as "Section 510"), which provides:

> It shall be unlawful for any person to discharge ... a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan ...

29 U.S.C. § 1140.  Defendants have offered nothing to rebut the plaintiffs' assumption that REMC's disability plan is an ERISA-qualifying employee benefit plan.  Without access to REMC's disability benefits plan, the Court cannot be convinced by - or dissuaded from - Plaintiffs' position that the plan is within ERISA's reach.[17]  The Court need not resolve this issue, however, as the Court finds that, even allowing plaintiffs the benefit of their assumption that the plan is an ERISA-qualifying plan, Deleva has not made the required showing for an ERISA violation.

The Sixth Circuit has adopted a burden-shifting approach in analyzing ERISA claims which implicate Section 510.  *See Humphreys v. Bellaire Corp.*, 966 F.2d 1037 (6th Cir. 1992).  To avoid summary judgment on a Section 510 claim:

---

[17] *See, e.g., Dist. of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 127 (1992) ("Subject to certain exemptions, ERISA applies generally to all employee benefit plans sponsored by an employer or employee organization. Among the plans exempt from ERISA coverage under § 4(b) are those "*maintained solely for the purpose of complying with* applicable workmen's compensation laws or unemployment compensation or *disability insurance laws*.") (internal citation omitted) (emphases added).

33

> [A] plaintiff must show the existence of a genuine issue of material fact that there was: '(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right which the employee may become entitled.' . . . If the plaintiff proves a *prima facie* case as set forth above, it is the employer's burden to 'introduce admissible evidence of a legitimate, nondiscriminatory reason for its challenged action.

*Humphreys*, 966 F.2d at 1043 (citing *Gavalik v. Cont'l Can Co.*, 812 F.2d 834, 852 (3rd Cir. 1987)).

Although neither Deleva nor the defendants have addressed this, the Sixth Circuit is aligned with other courts which  have found a "scienter" requirement in ERISA's anti-retaliation and interference provision.  To prove a violation of Section 510, therefore, an employee must establish more than a mere loss of benefits; he or she must demonstrate that the employer terminated the employee with the *specific intent* of preventing or retaliating for the use of benefits.[18]  No action will arise under ERISA's anti-retaliation provision where an alleged loss of rights under a benefit plan is a mere *consequence*, as opposed to the *motivating factor,* behind an employee's termination from employment. *See Ali v. Chelsea Catering*, 910 F. Supp. 338, 345-46 (N.D. Ohio 1995, Nugent, J.); *see also*

---

[18] *See Rush v. United Techs., Otis Elevator Div.*, 930 F.2d 453, 457 (6th Cir. 1991) (In order for an employee to show he was discharged in violation of Section 510, the employee "must show that [the employer] had a specific intent to violate ERISA."); *Orzechowski v. York*, 2007 WL 1245775, at *3, n.2 (N.D. Ohio, Apr. 27, 2007, O'Malley, J.) (slip copy) (noting that specific intent is "a required element of a claim under § 510"); *Schweitzer v. Teamster Local 100*, 413 F. 3d 533, 537 (6th Cir. 2005) (same); *Little v. Cox's Supermarkets*, 71 F.3d 637, 642 n. 3 (7th Cir. 1995)(holding that "a plaintiff in an ERISA action must demonstrate that the employer had the 'specific intent' to violate the statute."); *Teumer v. Gen. Motors Corp.*, 34 F.3d 542, 550 (7th Cir. 1994) ("A plaintiff seeking relief under Section 510 must establish that the complained of action affecting his employment situation was taken by his employer with the specific intent of interfering with his benefit rights ... the plaintiff must ultimately show that a desire to frustrate [the plaintiff's] attainment or enjoyment of benefit rights contributed toward the employer's decision and [the plaintiff] can avoid summary judgment only if the materials properly before the district court, construed sympathetically, allow for such a conclusion."); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 347 (3d Cir. 1990) ("To recover under Section 510 the employee must show that the employer made a conscious decision to interfere with the employee's attainment of ... benefits.").

34

*Humphreys*, 966 F.2d at 1043 (an employee need not demonstrate that the "sole purpose in discharging [the employee] was to interfere with [the employee's] pension benefits, but rather that it was a motivating factor in the decision.").

The defendants' response to Deleva's ERISA claim is three-fold: (1) Deleva's right to participate in REMC's disability program was only available while he was employed as a "regular, full-time employee;" (2) ERISA requires exhaustion of administrative remedies, and Deleva did not immediately file a claim form after becoming "disabled" as required under the terms of REMC's disability program[19]; and, (3) there is no evidence Deleva was ever "disabled."

Plaintiffs address the defendants' argument regarding Deleva's status as a non-employee in a terse sentence, arguing that there is "at least a genuine issue of fact as to whether Defendants own actions violative of the FMLA caused Plaintiff to no longer be a regular full-time employee." (Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment at 17.)  By this statement, it appears Plaintiffs are claiming that the defendants' termination of Deleva, which they believe was in violation of the FMLA, was the sole cause for Deleva failing to meet the requirement of being a "regular, full-time employee" for purposes of being entitled to disability benefits.  Plaintiffs similarly respond to the defendants' arguments regarding Deleva's failure to exhaust administrative remedies with a limited discussion of the "futility" doctrine - claiming that any attempts by Deleva to file a disability claim would have been "futile" because Deleva was "terminated and ousted" from the

---

[19] REMC's employee handbook contains an overview of its short-term disability plan. The handbook includes the following provision: "A short-term disability claim form, which can be obtained from the Human Resources Department, *must be filed immediately after becoming disabled*.  A short-term disability leave must be *certified by a physician's or licensed health care professional's statement* identifying the nature of the disability, and stating or estimating the date when the employee will be able to return to work."  (Defendants' Motion for Summary Judgment, Ex. G (emphases added)).

35

group plan, and his request for paperwork was never responded to.[20]  Plaintiffs have not, however, responded whatsoever to the defendants' contention that Deleva was not "disabled" for purposes of REMC's short-term disability plan.

The Court need not address the parties' arguments on these issues in order to make a decision with respect to Deleva's ERISA claims.  This is because the Court easily finds that Deleva has not presented *any* evidence to support an essential element of his claim: i.e., he has not demonstrated that the defendants had the requisite *intent* to interfere with Deleva's claimed disability benefits.  Indeed, there is only a conclusory allegation in the Complaint that the defendants "unlawfully" terminated his benefits.

The Court finds the following facts determinative on this point.  In response to Deleva's (now resolved) FMLA claims, the defendants argue they believed Deleva resigned on March 21, 2004, based upon: (1) Deleva's statements to Johnston that day; (2) Deleva's statements to other REMC employees; and, (3) Deleva's lack of response to Johnston's request for clarification of Deleva's "declared status." The record supports such a belief.

Plaintiffs counter that Deleva did not resign at that time but was, instead, terminated.  It is indisputable from the record, however, that *prior* to the time Deleva either resigned (according to the defendants) or was terminated (according to Plaintiffs), Deleva never applied for disability benefits, never sought copies of disability benefits materials, and *never even mentioned the possibility of receiving disability benefits* to Johnston or anyone else at REMC.  The record merely reflects that a

---

[20] As discussed in the factual background of this Opinion, Deleva's request for paperwork *was* responded to; the response simply was that the company no longer considered him to be an employee based upon his (purported) resignation, and that he was entitled to continue his benefits under COBRA.

generic e-mail was sent from Deleva to Human Resources asking for all paperwork generally associated with "leave" - not for any specific claim forms, or materials relevant to disability benefits.  Not only was this generic request sent to a non-decision maker, it was submitted almost *three weeks after* it appears, by all indications in the record, that a decision was made to separate Deleva from his employment.  The Court finds Deleva's belated request for general "leave" paperwork is, therefore, insufficient as a matter of law to establish that the "motivating factor" behind the defendants' employment decision was the *possibility* of Deleva receiving future disability benefits (if other conditions were met, such as certification by a health care provider).  The defendants are, therefore, entitled to summary judgment on Deleva's ERISA claims, and Counts Five and Six of the Amended Complaint are dismissed with prejudice.

### 4.  State law claims

While the Court has devoted significant time and attention to Deleva's federal-based claims, this case was framed primarily as a contract dispute when it was removed to this Court by the defendants.  Indeed, the parties have spent an substantial amount of time - by virtue of their briefing and the submitted affidavits - addressing the events leading up to the failed business deal between Deleva and the defendants.  Given the earlier rulings made in this Opinion, however, there are no longer any federal causes of action in the Amended Complaint that can be sustained in this action.

Where all federal claims are dismissed prior to trial, the general rule is that it is appropriate for the trial court to decline to exercise jurisdiction over pendant state law causes of action. This rule is not inviolate, however, and the Court retains discretion in appropriate circumstances to consider purely state law matters even after the federal predicate for jurisdiction is found lacking.  *See Harper v. AutoAlliance Int'l., Inc.*, 392 F.3d 195, 210 (6th Cir. 2004) ("Dismissal is not mandatory, however,

because supplemental jurisdiction is a doctrine of discretion, not of plaintiff's right."); *see also Taylor v. First of Am. Bank-Wayne*, 973 F.3d 1284, 1287 (6th Cir. 1992) (there is no mandatory rule). Given the advanced age of this case, and the ease with which the Court finds it can resolve Deleva's state law claims, the Court will exercise its discretion to hear Deleva's breach of contract and promissory estoppel claims.

### a.      Breach of Contract (Count Four)

In Count Four of the Amended Complaint, Plaintiffs assert, *inter alia*, that the defendants' promise of future ownership in REMC - and Deleva's acceptance of it - constitutes a valid and binding contract for the purchase and sale of stock.  By refusing to proceed with the sale, the plaintiffs claim defendants breached that contract.  The defendants deny any contract existed; their position is that there are too many uncertainties - including those discussed earlier in this Opinion - to constitute a binding contract or agreement.

In order to establish breach of a contract in Ohio, a plaintiff must demonstrate the following elements by a preponderance of the evidence: (1) that a contract existed; (2) that the plaintiff fulfilled his or her obligations; (3) that the defendant failed to fulfill his or her obligations; and, (4) that damages resulted from this failure. *Lawrence v. Lorain Cty. Community College*, 127 Ohio App. 3d 546, 548-49 (Ohio App. 9th Dist. 1998).  As the plaintiffs point out, a necessary predicate for demonstrating the existence of a binding contract is that "both parties consented to the terms of the contract, that there was a 'meeting of the minds' of both parties, and that the terms of the contract were definite and certain." *Mondl v. Mondl*, 2001 WL 1545638, 2001-Ohio-1878, at *3 (Ohio App. 9th Dist.) (citing *McSweeney v. Jackson*, 117 Ohio App. 3d 623, 631 (1996)).  If a plaintiff cannot demonstrate the existence of a valid and binding contract, it is of no consequence that any claimed agreement was not ultimately

38

fulfilled.

Deleva concedes he had reservations about the proposal being discussed in August 2002; therefore, he remained silent at that time - rather than hastily accept the proposal.  (Deleva Dep. pp. 149-50.)  The most the plaintiffs claim in this case, accordingly, is that "there was an understanding that [the proposal discussed at the August 2002 meeting] was the framework of our agreement, and that the transition and the consummation of this agreement was entirely up to, or substantially up to Mark Johnston."  (*Id*. pp. 175-76.)  The "consummation" of any agreement between the defendants and Deleva, however, was entirely contingent upon a *condition precedent*; the deal depended upon Thomas Rankin first agreeing to the terms of any sale of his stock to Johnston.  Because this event was to occur prior to any subsequent re-sale of that stock to Deleva and Miller, the defendants claim there could be no "meeting of the minds" - or definiteness - as to the terms of any future agreement between Deleva and the defendants.

Deleva's own deposition testimony, outlined in the background of this Opinion, makes it abundantly clear that numerous material terms typically addressed in a stock purchase agreement (such as the assumption of corporate liabilities and debts, any pre-existing encumbrances on the stock, the date of stock transfer, the frequency of re-payment for the stock purchase, etc.) were never even discussed, or negotiated, until well *after* the August 2002 meeting - *if ever*.  Responding to numerous questions regarding the terms of the August 2002 agreement, Deleva consistently testified he believed "we would work out the details," and/or he believed the terms had been "generally resolved."  (*Id.* pp. 93, 111-26.)  Indeed, regarding the all-important date upon which he was to acquire ownership of the former Rankin stock, Deleva testified: "There was no specific date.  It was general." (*Id.* pp. 101, 152). Nor was there any agreement as to what documents would be delivered to whom, and when, in order

39

to solidify Deleva's ownership interest in the REMC Entities.  (*Id.* p. 152.)

A December 27, 2005 Affidavit submitted by Miller further confirms that: "While there were discussions [at the August 2002 meeting] about potential terms upon which the acquisition of the company would be made by Mr. Deleva and I, *we did not discuss in detail*."  (Miller Aff. ¶ 6, Dec. 27, 2005 (emphasis added).)  Miller attests "... the terms were to be negotiated at a later date.  We continued thereafter to have *negotiations and discussions* as to what the terms would be.  The terms of the *proposal* were changed by Mr. Johnston repeatedly during the *negotiations*."  (*Id.* at ¶ 7 (emphases added).)[21]  Likewise, an Affidavit submitted by Thomas Rankin makes it clear that: "While there were discussions about potential terms upon which the acquisition of the company would be made by Ms. Miller and Mr. Deleva, they did not reach any agreement as to the terms of such future acquisition, nor could they, since Mr. Johnston did not yet own my shares, and our terms had not yet been agreed to." (Rankin Aff. ¶ 5, Dec. 14, 2005.)  He confirms Deleva's deposition testimony that: "While there were discussions about potential manners of financing the acquisition by Ms. Miller and Mr. Deleva, there

---

[21]     Plaintiffs apparently obtained from Miller, on February 24, 2006, a completely contradictory Affidavit in which Miller alters her prior testimony by claiming there was an offer, acceptance, and an agreement with definite terms for the sale of 48% of REMC's stock - to Deleva and Miller - as of the August 2002 meeting.  Her explanation for this blatant change in her testimony is that "after much annoyance and harassment [by counsel for the defendants], and in order to be finished with the entire cumbersome process, I rewrote portions of the [original] Affidavit, signed it, and returned it to their offices."  (Miller Aff. ¶ 11, Feb. 24, 2006.)  She further claims that she later reviewed her December 27, 2005 Affidavit, and that it "fails accurately to restate the events in 2002-2004 regarding the attempted purchase of REM shares by John Deleva and me ..."  (*Id.* ¶ 12.)  By signing and notarizing her first Affidavit, however, and by admitting that she was detailed enough to revise portions of it, Miller cannot now claim that her original Affidavit is not accurate.  The Court, therefore, will grant the defendants' request to ignore Miller's second Affidavit as a subsequent contradictory statement under the reasoning of *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1977) and *Dotson v. U.S. Postal Serv.*, 977 F.2d 976, 978 (6th Cir. 1992) (both cited by the court in *Breier v. ITT Industries, Inc.*, 2000 WL 33668034 (N.D. Ohio, Katz, J.)).

40

was no discussion regarding the number of shares they would acquire from Mr. Johnston, the assumption of corporate debts and liabilities, or the manner and timing of transfer of the shares." (Rankin Aff. ¶ 6, Dec. 14, 2005.)

Astonishingly, even the terms which the plaintiffs now claim were "clear and definite" as of August 2002 - the purchase price and financing - were subsequently re-negotiated and changed. Plaintiffs claim the original contract price was $1 million dollars for all of Thomas Rankin's former shares of REMC stock, and that REMC would generously finance the purchase by way of company disbursements to Deleva.  Even as to his initial belief, however, Deleva testified that he "understood the distributions would come from profits, personal revenues, but I did not have a complete and detailed understanding of what Mark's representations meant."  (Deleva Dep. pp.  186-87.)  This presumably is because Deleva "had no agreement with Mark Johnston specific to the repayment."  (*Id*. p. 189.)

Deleva, accordingly, concedes there was no discussion whatsoever as to what would happen with respect to the company disbursements, and Deleva's outstanding payment obligation, if Deleva did not continue his employment with the REMC Entities.  (*Id*. p. 95.)  Nor was there any discussion or agreement on what would occur if Deleva defaulted on any payment.(*Id*. p. 123.)  Deleva even admits that Johnston's understanding of the initial "agreement" may have been different than Deleva's.  (*Id*. p. 197.)  Deleva, therefore, later proposed to Johnston that he and Miller pay a total purchase price of $1.3 million for Rankin's former stock, with their payment to be made in cash.  This, of course, is not what the plaintiffs now claim they understood the "deal" between Deleva and the defendants to be.

Under these circumstances, the Court finds there was no "meeting of the minds" on any of the material terms of a stock purchase agreement.  Plaintiffs have failed to demonstrate a binding contract or agreement emanating from the discussions that occurred in August 2002, and Count Four of the

41

Amended Complaint must be dismissed with prejudice.

      **b.**     **Promissory Estoppel (Count Three)**

Plaintiffs assert in Count Three of the Amended Complaint that: (a) the defendants issued a promise; (b) which was accepted by Deleva; (c) which the defendants knew and intended that Deleva would rely upon; (d) which Deleva did rely upon, in good faith, to his detriment; and, (e) Deleva suffered damages.  (Amended Compl. ¶¶ 57-60.)  As best as can be determined from the Amended Complaint and the plaintiffs' Reply brief, Deleva's claim that, in reliance on the promise of a stock sale to him, he of became a member of management and took on additional responsibilities - such as training and assisting new REMC sales professionals on Deleva's methods for closing loans, handling customer service issues for these new professionals, interviewing additional sales professionals, and development of marketing and sales strategies - all in anticipation of becoming an owner of the REMC Entities.

Under Ohio law, a promissory estoppel claim must satisfy the following elements: "(1) a promise, clear and unambiguous in its terms; (2) reliance upon the promise; (3) reliance was reasonable and foreseeable; and (4) [plaintiff was] injured by [his] reliance." *Hale v. Volunteers of Am.*, 158 Ohio App. 3d 415, 429 (Ohio App. 1st Dist. 2004).  Defendants contend the plaintiffs' estoppel claim fails for the same reason as their breach of contract claim; primarily, because there was no "clear and unambiguous" terms for a promise.  The defendants further argue that the uncertainties inherent in the discussions between Deleva and the defendants foreclose the possibility of "reasonable" reliance on the part of Deleva.

As with the plaintiffs' breach of contract claim, the Court is satisfied that the terms of any alleged promise on the part of the defendants were so far outside the realm of "clear and unambiguous" as to negate any belief on the part of Deleva that his future ownership in the REMC Entities was a "sure

42

thing." Deleva himself, through his silence in the face of the proposal being discussed in August 2002, manifested that he was not certain about the deal.  His express admission of "reservations" about the deal is a fatally clear statement that Deleva was not sure that the deal was in his best interests, and certainly demonstrates he had no reason to rely on anything proposed to him at that time.  There is nothing in the subsequent discussions between the defendants and Deleva which would indicate that a definite promise, with clear terms, was made to Deleva - or that it would have been reasonable to rely on that promise as his sole basis for becoming a member of management.  Plaintiffs' promissory estoppel claim, therefore, is dismissed with prejudice.

IV.     **CONCLUSION**

In light of the foregoing, it is

**ORDERED THAT** the *Motion for Summary Judgment* (Doc. No. 50) filed by Real Estate Mortgage Corp., Real Estate Mortgage Corp. Escrow Company, and Mark Johnston is **<u>GRANTED</u>**.

**IT IS SO ORDERED**.

<u>s/Kathleen M. O'Malley</u>
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: June 21, 2007**

43